## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ANNA M. ESSARY,

      Plaintiff,

vs.

JOANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.

FILED

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

APR 1 7 2006

MATTHEW J. DYKMAN
CLERK

Civ. No. 05-194 RHS

### MEMORANDUM OPINION AND ORDER

1. THIS MATTER comes before the Court on Plaintiff's Motion to Reverse or Remand Administrative Agency Decision ("Motion"), filed July 28, 2005 **[Doc. 7]**. Plaintiff's application for disability benefits was protectively filed on February 23, 2000 and alleges a disability which commenced December 7, 1999. (Tr. at 72, 237.) Following a hearing that was held on November 7, 2001, the Administrative Law Judge ("ALJ") issued a decision denying Plaintiff's claim for disability benefits. (Tr. at 16.) Plaintiff eventually appealed that decision to this Court, which remanded the matter to the Commissioner for further proceedings. See Essary v. Barnhart, ("Essary I") 02-Cv-450 JP/ACT (Order of Remand, filed April 18, 2003 **[Doc. 17]**.)

2. On remand, and following a hearing held on September 23, 2004, the ALJ issued a partially favorable decision regarding Plaintiff's application for disability benefits on December 22, 2004.[1] (Tr. at 232.) In her Motion, Plaintiff seeks judicial review of the ALJ's decision. Apparently, the Appeals Council has denied Plaintiff's request for review of the ALJ's partially

---

[1]The ALJ concluded that Plaintiff was disabled beginning on, but not prior to, January 19, 2003. (Tr. at 247 ¶13.)

favorable decision.[2] Thus, the Commissioner's decision became final.

3. The standard of review in social security appeals is whether the Commissioner's final decision, in this case the ALJ's decision, is supported by substantial evidence. See Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993) (citations omitted). Additionally, the Commissioner's final decision can be reversed if the ALJ failed to apply the correct legal tests. See id. (citation omitted).

4. "To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity." Id. at 1486 (citing 42 U.S.C. § 423 (d)(1)(A)); see also 42 U.S.C. § 1382c(a)(3)(A). Social Security Regulations require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. See Thompson, 987 F.2d at 1486 (citing 20 C.F.R. §§ 404.1520(a - f), 416.920) (other citation omitted). The sequential evaluation process ends if at any step the Commissioner finds that the claimant is disabled or not disabled. See Thompson, 987 F.2d at 1486 (citations omitted).

5. At the first four levels of the evaluation, the claimant must show: (1) that she is not working; (2) that she has an impairment or combination of impairments severe enough to limit the ability to do basic work activities; (3) that the impairment meets or equals one of the listing

---

[2]The Administrative Transcript ("Tr.") contains neither Plaintiff's request for review of, nor the Appeals Council decision regarding, the ALJ's December 22, 2004 decision. However, Plaintiff alleges that she filed the instant Complaint "following [the] receipt of an unfavorable decision by the Social Security Appeals Council . . . . [and] seeks a review of the Appeals Council decision as provided by 42 U.S.C. § 405(g)." (Complaint ¶4 **[Doc. 1]**.)  In her Answer, the Commissioner specifically admits Plaintiff's allegation. (Answer ¶1 **[Doc. 5]**.)

of impairments in 20 C.F.R. Pt. 404, Subpt.P, App.1; or (4) that she is unable to perform work done in the past. At the fifth step, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. See Thompson, 987 F.2d at 1487 (citations omitted); 20 C.F.R. §§ 404.1520(f), 416.920(f). In this case, the ALJ determined that Plaintiff was not disabled at step five of the sequential evaluation process.

6. Plaintiff was born on January 19, 1948 and has completed two years of college. (Tr. at 72, 85.) She has worked in the past as a waitress, nurse aide, staff LPN and staff RN. (Tr. at 80.) Plaintiff claims that her ability to work is limited because of "stomach pain, hiatal hernia, muscle weakness, chronic fatigue, joint pain, chronic depression, etc. called fibromyalgia; hypertension; [and] carpal tunnel syndrome-hands." (Tr. at 79.) Plaintiff also alleges that she is unable to work because of "continuous pain, inability to stand longer than 5-10 min[utes], need [for] frequent rest periods, inability to use hands greater than 10 min[utes,] unable to sit more than 20 min[utes], [and] need to lay down frequently." (Id.) On March 3, 2000, Plaintiff indicated that her medications included: prilosec, prozac, maxzide, synthroid, naproxen, zyrtec, cyclobenzaprine, clonazepam, premarin, avapro, vicodin, ambien, and tylenol. (Tr. at 84, 86.)

7. The only "Question Presented" in Plaintiff's Motion is: (I) "Whether the ALJ erred in failing to accord proper weight to the opinions of the plaintiff's treating physicians." (Motion at 2). However, within the narrative of her "argument," Plaintiff raises two additional allegations of error: (II) the ALJ "improperly discounted the Plaintiff's allegations of limitations"; and (III) the ALJ "improperly applied the Medical-Vocational Guidelines ("Grids")." (Tr. at 19, 21.)

*First Alleged Error - the ALJ's consideration of medical opinion evidence*

3

8. Plaintiff claims that the ALJ erred when she "disregarded the opinions of four of the Plaintiff's treating doctors." (Motion at 16.) Specifically, Plaintiff contends that "the opinions of Drs. Bankhurst, Ashdown, Giovanniello, and Hobbs should 'outweigh' the opinion of Dr. Jakins."[3] (Motion at 19.) Because the Court finds that the ALJ improperly analyzed the opinions of Drs. Bankhurst and Giovanniello,[4] this matter should be remanded for further proceedings.

9. "According to what has come to be known as the treating physician rule, the Commissioner will generally give more weight to medical opinions from treating sources than those from non-treating sources. In deciding how much weight to give a treating source opinion, an ALJ must first determine whether the opinion qualifies for controlling weight." Langley v. Barnhart, 373 F.3d 1116, 1119 (10th Cir. 2004) (citations and internal quotations omitted). To make this determination, the ALJ "must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." Id. (citations omitted). If the opinion is well-supported, the ALJ "must then confirm that the opinion is consistent with

---

[3]The Commissioner does not dispute Ms. Essary's assertion that Arthur D. Bankhurst, M.D., Franklin D. Ashdown, M.D., Michael Giovanniello, M.D., and Crit Hobbs, M.D. are treating physicians. Nor does the Commissioner disagree that Alan Jakins, M.D. is a Disability Determination Services [DDS] consultative physician who examined Ms. Essary on one occasion.

[4]While Plaintiff apparently contends the ALJ improperly weighed the opinions of *four* treating physicians, she provides supporting argument only with respect to the opinions of Drs. Bankhurst and Giovanniello. The first fifteen pages of Plaintiff's twenty-three page Motion and attached brief consist almost entirely of titles, captions, a list of evidence, a review of procedural and factual history, and a general discussion of disability and judicial review standards. The remainder of Plaintiff's Motion contains approximately seven and one-half pages of "argument and authorities." (Motion at 15.) With the exception of the single conclusory contention above, the argument portion of Plaintiff's Motion contains no mention of Dr. Ashdown or Dr. Hobbs. Thus, as Defendant correctly notes, Plaintiff wholly fails to present any argument regarding the opinion of either physician.

other substantial evidence in the record.  If the opinion is deficient in either of these respects,

then it is not entitled to controlling weight."  Id. (citations and internal brackets omitted).

10.  However, "[e]ven if a treating physician's opinion is not entitled to controlling

weight, treating source medical opinions are still entitled to deference and must be weighed using

all of the factors provided in § 404.1527.[5]"  Id. (citations, internal quotation marks and internal

brackets omitted).  The ALJ "must give *good reasons* ... for the weight assigned to a treating

physician's opinion, that are sufficiently *specific* to make clear to any subsequent reviewers the

weight the adjudicator gave to the treating source's medical opinion and the reason for that

weight.  If the ALJ rejects the opinion completely, he must then give specific, legitimate reasons

for doing so."  Id. (citations, internal quotations marks and internal brackets omitted) (emphasis

added).

*Dr. Bankhurst's opinion*

11.  The records indicate that Dr. Bankhurst is a rheumatologist who examined Plaintiff

on at least two occasions.  (Tr. at 243.)  On January 4, 2001, Dr. Bankhurst completed a

Fibromyalgia Residual Functional Capacity Questionnaire ("RFC report").  (Tr. at 204-09.)  In

his RFC report, Dr. Bankhurst indicated that Plaintiff met the American Rheumatological criteria

for fibromyalgia and listed Plaintiff's other impairments as: "hypertension, GERD

---

[5]"Those factors are: (1) the length of the treatment relationship and the frequency of
examination; (2) the nature and extent of the treatment relationship, including the treatment
provided and the kind of examination or testing performed; (3) the degree to which the
physician's opinion is supported by relevant evidence; (4) consistency between the opinion and
the record as a whole; (5) whether or not the physician is a specialist in the area upon which an
opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or
contradict the opinion."  Langley, 373 F.3d at 1119 (citing Watkins v. Barnhart, 350 F.3d 1297,
1301 (10th Cir. 2003)).

[gastroesophageal reflux disease], muscle weakness, occasional dizziness, diffuse myalgia [and] arth[r]algias[,] [and] general hayfever/allergies." (Tr. at 204.) Dr. Bankhurst identified "the clinical findings, laboratory and test results which show [Plaintiff's] . . . medical impairments [as] . . . chronic joint and muscle pain, myalgia, muscle weakness, tender points, fatigue, occasional dizziness, negative CBC, negative UA, negative metabolic problems [and] general skeletal muscle tenderness." (Tr. at 204.)

12. In his RFC report, Dr. Bankhurst opined that Plaintiff's experience of pain or other symptoms would "frequently" be severe enough to interfere with her attention and concentration, and that Plaintiff was incapable of tolerating even low stress jobs. (Tr. at 205.) Among other findings, Dr. Bankhurst indicated that Plaintiff can sit and stand/walk for a total of "less than 2 hours" out of an eight hour working day. (Tr. at 206.) He further indicated that Plaintiff must be able to walk every twenty to thirty minutes for one to two minutes at a time, needs a job "which permits shifting positions at will from sitting, standing or walking," and must use a cane or other assistive device when standing/walking. (Tr. at 206-07.)

13. Dr. Bankhurst stated that Plaintiff can occasionally lift and carry less than ten pounds[6] and has significant limitations in doing repetitive reaching, handling or fingering. (Tr. at 207.) Finally, Dr. Bankhurst estimated that Plaintiff is likely to miss work "[m]ore than four times a month" as a result of her impairments or treatment. (Tr. at 209.)

14. The ALJ acknowledged that Dr. Bankhurst set forth "work limitations"[7] in his RFC

---

[6]Dr. Bankhurst stated that Plaintiff can never lift and carry ten or more pounds. (Tr. at 207.)

[7]The ALJ specifically referred to Dr. Bankhurst's limitations regarding Plaintiff's ability to sit, stand and walk. (Tr. at 243.)

report, "[d]espite . . . minimal findings"[8] from Plaintiff's initial examination in November of

2000. (Tr. at 243.)  However, the ALJ discounted the limitations as being "clearly based on the

claimant's allegations, not on clinical or laboratory findings."[9]  (Tr. at 243.)

*Dr. Giovanniello's opinion*

15.  The ALJ found that Dr. Giovanniello[10] treated Ms. Essary "from October 8, 2001

through April 26, 2002." (Tr. at 243.)  On November 6, 2001, Dr. Giovanniello completed a

"Medical Opinion Re: Ability to do Work-Related Activities (Physical)" and a "Fibromyalgia

Residual Functional Capacity Questionnaire" (Tr. at 223-31.)  As the ALJ noted, Dr.

Giovanniello indicated in these forms that Plaintiff "had numerous limitations, which in

summary would limit her to working no more than 4 hours a day, with position changes between

sitting and standing every 4 hours. (Ex. 15F) [Tr. at 226]." (Tr. at 243.)  Dr. Giovanniello

identified the clinical findings, laboratory and test results which showed Plaintiff's impairments

as: "fibromyalgia[11] . . . [and] [left] carpal tunnel." (Tr. at 226.)  The ALJ did not assign

"controlling weight to Dr. Giovanniello's opinions, because the limitations that he sets are clearly

---

[8]The ALJ described the "minimal findings" as: a showing of "18 out of 18 positive trigger points, but no muscle weakness or joint pathology . . . . [and] laboratory studies, which were negative except for a slightly elevated sedimentation rate and C-reactive protein." (Tr. at 243.)

[9]Plaintiff misquoted the ALJ as finding with respect to Dr. Bankhurst that "[n]either his treatment notes or this form included clinical signs and laboratory findings to support his conclusions." (Motion at 16 (citing Tr. at 241).)  The ALJ offered this statement as a basis for rejecting Dr. Ashdown's, not Dr. Bankhurst's, opinion. (See Tr. at 241.)

[10]Dr. Giovanniello indicates that he holds board certifications in "Physical Medicine & Rehabilitation," "Electrodiagnostic Medicine," and "the Subspecialty of Pain Management." (Tr. at 316.)

[11]Dr. Giovanniello stated that Plaintiff met the American College of Rheumatology criteria for fibromyalgia. (Tr. at 226.)

7

based on the claimant's statements to him, not on clinical signs and laboratory findings." (Tr. at 243.)

*Discussion*

16. The ALJ's analysis of the opinions of Drs. Bankhurst and Giovaniello is deficient in several respects. First, although the ALJ acknowledged Dr. Bankhurst's and Dr. Giovanniello's findings, she wholly failed to analyze their opinions pursuant to the "treating physician rule" set forth above. For example, the ALJ "did not expressly state whether [Dr. Bankhurst] treated [Plaintiff] as a treating physician." Moore v. Barnhart, 114 Fed.Appx. 983, 993 (10th Cir. Nov. 19, 2004).[12] More important, while the ALJ explicitly declined to give Dr. Giovaniello's opinion controlling weight, and implicitly found that Dr. Bankhurst's opinion was not controlling,[13] she "did not relate what weight [if any] [s]he *did* give [t]he[i]r opinions." Id. (emphasis added). This was error.

17. "[E]ven if a treating source's opinion is not entitled to controlling weight, it is still entitled to deference and must be properly evaluated." Id. (citation omitted); (see note 5, supra.) And when the ALJ entirely rejects the opinion of a treating medical source, she is required to provide specific and legitimate reasons for doing so.[14] See id. The ALJ neglected to follow these

---

[12]This case was not selected for publication in the Federal Reporter and is cited only for its persuasive value and for its assistance to the Court. See 10th Cir. Rule 36.3. A copy of the decision is attached to this Memorandum Opinion and Order. See id. 36.3(C).

[13]The ALJ afforded the "*greatest* weight to the opinions of the consultative physician Dr. Jakin[s], the consultative psychiatrist Dr. Hollingsworth, the treating physician Dr. Warden, and the nonexamining state agency physicians." (Tr. at 244 (emphasis added).)

[14] Despite the ALJ's implication that some weight was assigned to Dr. Bankhurst's and/or Dr. Giovanniello's opinions, it is not clear that the ALJ adopted any of the findings set forth in their opinions.

steps in analyzing Dr. Bankhurst's and Dr. Giovanniello's opinions.

18. Second, the ALJ's primary, if not the only, reason for discounting both Dr. Bankhurst's and Dr. Giovanniello's opinions is suspect. The ALJ discounted the limitations set forth by both physicians because they were "clearly based on claimant's statements [or allegations], not on clinical [signs] or laboratory findings." (Tr. at 243.) However, this reasoning has been criticized by the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") under similar circumstances described in Moore. In that case, the ALJ stated, using strikingly similar language, that a doctor's "opinions on plaintiff's limitations appeared to be based more on [plaintiff's] subjective complaints and the diagnosis of fibromyalgia than on any clinical signs or laboratory findings." Moore, 114 Fed.Appx. at 991 (citation and internal quotation marks omitted). The Tenth Circuit found that such statements were "speculative inferences from medical reports that an ALJ may not make, . . . [and] reflect[ed] the ALJ's fundamental misperception of the nature of fibromyalgia." Id. (citing McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002)).

19. Plaintiff in this case "primarily suffers from fibromyalgia, a condition consisting of feeling pain all over the body."[15] Essary I (Memorandum Opinion and Order at 1, filed April 18, 2003 [Doc. 16]). "[I]ts symptoms are entirely subjective" and "[t]here are no laboratory tests for the presence or severity of fibromyalgia." Sarchet v. Chater, 78 F.3d 305, 306-07 (7th Cir. 1996) (cited in Moore, 114 Fed.Appx. at 991). "Indeed, it is the absence of symptoms ordinarily

---

[15] "Clinical signs and symptoms supporting a diagnosis of fibromyalgia under the American College of Rheumatology Guidelines include primarily widespread pain . . . and at least 11 of the 18 specified tender points on the body." Moore, 114 Fed.Appx. at 991 (citations omitted).

9

associated with joint and muscle pain that is one of the most striking aspects of this disease."
Moore, 114 Fed.Appx. at 991.

20. Here, the ALJ acknowledged Plaintiff's diagnosis of fibromyalgia, but seemed to
attach little or no significance to the same.[16]  As in Moore, it appears to this Court as if "the ALJ
did not fully understand the nature of plaintiff's diagnosed condition." Id. at 992.  Because the
ALJ did not follow the proper standards in evaluating the opinions of Drs. Bankhurst and
Giovanniello, his decision that Plaintiff was not disabled at any time before January 19, 2003 is
not supported by substantial evidence.

### Second and Third Alleged Errors -  the ALJ's credibility determination and application of the grids

21. Plaintiff apparently alleges that the ALJ improperly discounted Plaintiff's allegations
and improperly applied the grids.  Because a re-evaluation of the medical opinion evidence may
ultimately affect both the ALJ's credibility determination and application of the grids, it is not
necessary to address Plaintiff's claims of error regarding these factors.

22. However, the Court notes that the ALJ's credibility finding consists, in its entirety, of
the following: "Having considered the foregoing evidence, the undersigned finds that the
claimant's testimony as to the extent, intensity, and duration of subjective symptoms and
resulting limitations is credible only to the extent that she is limited to light exertional level work
. . . ." (Tr. at 244 (describing residual functional capacity finding).)  Consequently, it would be

---

[16]The ALJ found it "significant," however, that on April 26, 2002, Dr. Giovanniello "did
not report any positive trigger points on examination, and included in his list of diagnoses that of
'**History of** [emphasis added] fibromyalgia.'" (Tr. at 243.)  The "significance" of this
information is not evident to the Court, and the ALJ's statement is not sufficiently specific to
make clear what weight the ALJ afforded Dr. Giovanniello's opinion or the reasons for that
weight. See Langley, 373 F.3d at 1119.

difficult to discern the basis on which the ALJ discounted Plaintiff's allegations.[17]  On remand,

the ALJ should set forth the credibility analysis with sufficient specificity in order to allow for

meaningful review by a subsequent reviewer.  See, e.g., Kepler v. Chater, 68 F.3d 387, 391 (10th

Cir. 1995); see also Luna v. Bowen, 834 F.2d 161, 166 (10th Cir. 1987); Social Security Ruling

88-13.

　　　WHEREFORE,

　　　IT IS ORDERED that Plaintiff's Motion to Reverse or Remand Administrative Agency

Decision [Doc. 7] is GRANTED, and this matter is remanded for additional proceedings

consistent with this opinion, to include:

　　　(1)　　a re-evaluation of the medical opinions of Arthur D. Bankhurst, M.D. and Michael

　　　　　　Giovanniello, M.D.; and

　　　(2)　　additional proceedings in light of any new or changed findings following the re-

　　　　　　evaluation of Dr. Bankhurst's and Dr. Giovanniello's opinions, to include, as

　　　　　　necessary:

　　　　　　(a)　　a re-determination of Plaintiff's credibility, and

　　　　　　(b)　　a re-assessment of the application of the grids at step five.

                              Robert H. Scott          4-14-06
                              ROBERT HAYES SCOTT
                              UNITED STATES MAGISTRATE JUDGE

---

[17]For example, while the ALJ noted in the preceding paragraph that Plaintiff's "activities
of daily living are in sharp contrast to the limitations that she has reported to her treating
physicians" (tr. at 244), she did not explain how.  Nor did she indicate whether, or to what extent
this finding impacted the credibility of Plaintiff's hearing testimony.

Westlaw.

114 Fed.Appx. 983                                                                                                    Page 1
114 Fed.Appx. 983, 2004 WL 2634571 (C.A.10 (Kan.)), 101 Soc.Sec.Rep.Serv. 258
**(Cite as: 114 Fed.Appx. 983)**

**C**
Briefs and Other Related Documents
This case was not selected for publication in the
Federal Reporter.Please use FIND to look at the
applicable circuit court rule before citing this opinion.
Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)
United States Court of Appeals,Tenth Circuit.
Patrisha L. MOORE, Plaintiff-Appellant,
v.
Jo Anne B. BARNHART, Commissioner of Social
Security Administration, Defendant-Appellee.

> FN* On November 9, 2001, Jo Anne B.
> Barnhart became the Commissioner of Social
> Security. In accordance with Rule 43(c)(2)
> of the Federal Rules of Appellate Procedure,
> Ms. Barnhart is substituted for Kenneth S.
> Apfel as the appellee in this action.
> **No. 03-3253.**

Nov. 19, 2004.

**Background:** Claimant brought action, challenging
final decision of the Commissioner of Social Security
denying application for disability insurance benefits
(DIB) and supplemental security income (SSI). The
District Court affirmed decision, and claimant
appealed.

**Holdings:** The Court of Appeals, Bobby R. Baldock,
Circuit Judge, held that:

1(1) substantial evidence supported ALJ's
determination that claimant did not have a disabling
mental impairment, but

2(2) substantial evidence did not support ALJ's
determination that disability claimant was not disabled
by her fibromyalgia.

Reversed and remanded.

West Headnotes

**[1] Social Security and Public Welfare 356A**
**⟶143.60**

356A Social Security and Public Welfare
    356AII Federal Insurance Benefits in General
        356AII(C) Procedure
            356AII(C)2 Evidence
                356Ak143.30 Disability Claims, Evidence
as to
                356Ak143.60 k. Nature and Duration of
Impairment, Sufficiency. Most Cited Cases
Substantial evidence supported ALJ's determination
that social security disability claimant did not have a
disabling mental impairment during period prior to date
claimant was previously found to be disabled; there
were no clinical signs or laboratory findings of any
significant mental impairment that could reasonably be
expected to produce disabling symptoms.

**[2] Social Security and Public Welfare 356A**
**⟶142.10**

356A Social Security and Public Welfare
    356AII Federal Insurance Benefits in General
        356AII(C) Procedure
            356AII(C)1 Proceedings in General
                356Ak142.10 k. Findings and
Conclusions. Most Cited Cases

    **Social Security and Public Welfare 356A**
**⟶143.60**

356A Social Security and Public Welfare
    356AII Federal Insurance Benefits in General
        356AII(C) Procedure
            356AII(C)2 Evidence
                356Ak143.30 Disability Claims, Evidence
as to
                356Ak143.60 k. Nature and Duration of
Impairment, Sufficiency. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 Fed.Appx. 983                                                                         Page 2
114 Fed.Appx. 983, 2004 WL 2634571 (C.A.10 (Kan.)), 101 Soc.Sec.Rep.Serv. 258
(Cite as: 114 Fed.Appx. 983)

Substantial evidence did not support ALJ's determination that social security disability claimant was not disabled by her fibromyalgia; the ALJ improperly required that the fibromyalgia diagnosis be established by a laboratory test, which was not possible with fibromyalgia, failed to relate what weight he gave to treating physician's opinions concerning claimant's fibromyalgia, mischaracterized what the treating physician reported concerning claimant's ability to work, and suggested numerous procedures and treatments that the claimant did not undergo without any corresponding determination that any were ever medically prescribed or would have achieved a better diagnosis or relief from pain.

*983 Steven M. Tilton, Tilton & Tilton, Topeka, KS, for Plaintiff-Appellant.
D. Brad Bailey, Office of the United States Attorney, Topeka, KS, for Defendant-Appellee.

Before EBEL, BALDOCK, and LUCERO, Circuit Judges.

#### *984 ORDER AND JUDGMENT

FN** This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.BOBBY R. BALDOCK, Circuit Judge.

**1 After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R.App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Plaintiff-appellant, Patrisha L. Moore, appeals a district court order affirming the Commissioner's determination she is not entitled to Social Security benefits for the

period from November 30, 1994 through March 23, 1998. We reverse and remand for further proceedings.

Plaintiff filed for Social Security Disability and Supplemental Security Income benefits, with an amended alleged onset date of November 30, 1994. The underlying basis for her disability claim was an automobile accident on July 12, 1994, which resulted in severe problems with her back and neck. She continued working part-time as a home care psychiatric aide until she reinjured herself on November 21, 1994; the parties agree that plaintiff has not worked since November 30.

After plaintiff's benefits applications were denied initially and on reconsideration, she was granted a hearing in 1996 before Administrative Law Judge (ALJ) Bono. ALJ Bono's 1996 decision denying benefits was affirmed by the Appeals Council on March 23, 1998. In April of 1998, plaintiff filed new applications for benefits, alleging a March 24, 1998 onset date. These second applications resulted in a favorable determination in April of 1999. Aplt.App., Vol. II at 652.

FN1. The exact basis for this award is unclear from the record. Thus we do not know whether plaintiff was awarded benefits based on physical or mental impairments, or a combination of both.

Meanwhile, in May of 1998, plaintiff filed her complaint in district court seeking review of the Commissioner's decision denying her first claims for benefits. In December, the Commissioner moved to remand the matter to the agency for further proceedings because ALJ Bono had not properly evaluated plaintiff's alleged mental impairment, nor had he completed a Psychological Review Technique Form in accordance with 20 C.F.R. § 404.1520a(d) (Aplt.App., Vol. II at 468-72). The district court granted the motion, and the Appeals Council subsequently remanded the case for a new ALJ hearing. Id. at 474-78.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 Fed.Appx. 983
114 Fed.Appx. 983, 2004 WL 2634571 (C.A.10 (Kan.)), 101 Soc.Sec.Rep.Serv. 258
(Cite as: 114 Fed.Appx. 983)

Page 3

A supplemental hearing was held in June of 2000 before ALJ Reed, who concluded plaintiff was not disabled prior to March 24, 1998.   The Appeals Council affirmed, and the district court upheld that determination.

### Standard of Review

Our standard of review is well established:
We review the agency's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.   Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.   However,*985 [a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it.   The agency's failure to apply correct legal standards, or show us it has done so, is also grounds for reversal. Finally, because our review is based on the record taken as a whole, we will meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking into account whatever in the record fairly detracts from its weight. However, [w]e may neither reweigh the evidence nor substitute our discretion for that of the [Commissioner].

**2 *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir.2004)* (quotations and citations omitted).

### Medical Evidence

The background facts are as follows.   The day after the July 1994 car accident, plaintiff was treated at the St. Francis Hospital emergency room for pain and assessed with a hip contusion. Aplt.App., Vol. I at 133.   She was next treated by Dr. Randall McAllister on August 20, 1994, for continued complaints of neck pain, assessed as a cervical spasm.   *Id.* at 129.   He prescribed a soft cervical collar and physical therapy. *Id.* Three days later, plaintiff was placed on light work duty because of decreased cervical range of motion, headaches, a very guarded gait pattern, *id.* at 124, 127,

increased lumbar lordosis, and point tenderness in the "right upper trapezius and bilateral scalenes and suboccipital space." *Id.* at 123.   He rated her pain "as a 7 on a visual analogue slide," *id.*, and concluded that "[o]bjective findings concur with whiplash-type injuries." *Id.* at 124.   When plaintiff next saw Dr. McAllister again on October 16, he noted her continued complaints of persistent neck spasms, hip pain, left hand tingling with diminished grip strength on the left side. *Id.* at 118.   Plaintiff moved her head, neck, and trunk as a unit. *Id.* She reported she could not look down to read a newspaper. *Id.* X-rays of the hip were unremarkable, but the cervical spine showed a loss of lordosis. *Id.*

From October of 1994 through March of 1995, plaintiff was treated by Dr. David Wilson.   On October 26, 1994, plaintiff reported pain in her neck that was "constant in nature which she describe[d] as tingling, numb, and terrifying," *id.* at 146, with symptoms including "headaches, nausea, weakness, depression, vomiting, numbness, irritability, color changes, coldness/warmth, concentration deficits, bladder problems, bowel dysfunction, difficulty walking, and balance disturbances." *Id.* Her pain was exacerbated by standing, walking, bending, lifting, and overhead reaching, as well as tension, weather changes, and lack of sleep. *Id.* Based on his physical examination, which included a notation of cervical range of motion at "50% of normal in all planes with discomfort with all movement," *id.* at 147. Dr. Wilson assessed "[c]hronic cervical scapular thoracic and low back discomfort ... most likely musculoskeletal in nature." *Id.* at 148.   He continued plaintiff "on light duty with no pulling, pushing or lifting over 25 lbs." *Id.*

At her November 30 examination following the reinjury to her neck, Dr. Wilson assessed chronic pain syndrome "with cervical strain/myofascial pain syndrome in the cervical scapular thoracic and low back region," noting that work was aggravating her symptomology. *Id.* at 142.   Dr. Wilson also noted "trigger points in the upper *986 trap bilaterally, rhomboids bilaterally as well as quadratus lumborum bilaterally." *Id* He excused her from work for three weeks.   *Id.* The work absences were subsequently

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 Fed.Appx. 983
114 Fed.Appx. 983, 2004 WL 2634571 (C.A.10 (Kan.)), 101 Soc.Sec.Rep.Serv. 258
(Cite as: 114 Fed.Appx. 983)

Page 4

extended, and she did not return to work again.

**\*\*3** Because plaintiff did not improve, Dr. Wilson began administering a series of trigger-point injections beginning in February of 1995. *Id.* at 139. Although helpful initially for about ten days, *id.* at 138, the injections soon ceased to produce a significant change in her symptomology. *Id.* at 135. In March he found plaintiff had "significant trigger points in the right and left scalenes, right and left upper trap, right upper rhomboid, lower rhomboid, brachialis on the right, as well as bilateral quadratus lumborum and gluteus maximus." *Id.* Dr. Wilson believed that at that point he had nothing further to offer her and suggested she consider a chronic pain program, noting that she was "not ready to return to her previous work level." *Id.*

In April of 1995 plaintiff was evaluated by the Kansas Rehabilitation Hospital for its pain management program under which patients were expected to attend sessions eight hours a day for a minimum of three weeks at a minimum cost of $6900. *Id.* at 245, 249. In completing the program evaluation form, plaintiff listed her pain as both constant and unbearable, worsened by weather changes, nearly all physical activity, concentration, sleep loss, tension, and anxiety. *Id.* at 237. Her pain was "slightly less" after long hours of bed rest, dulled somewhat by heat and ice, and temporarily soothed by hot baths. She listed being "depress[ed][be]cause I can't join activities I use[d] to share [with] my friends," making her irritable and short-tempered, *id.* at 242, and stated she was "unable to concentrate to do any work." *Id.* at 243. Plaintiff did not pursue this program, however, apparently because of the cost.

During May of 1995, plaintiff was treated at the Gage Chiropractic Clinic, reporting headaches, pain in her shoulders, back, hips, knees and neck. *Id.* at 153. Her subjective listings of pain for headaches, neck, hip and pelvic areas were rated as "substantial" or "severe." *Id.* at 176. Objective notations of spinal motion rated her "poor" for neck and back motion. *Id.* at 177. In addition to multiple and constant pains, she also reported numbness, tingling, weakness, and dizziness. *Id.* She further indicated that therapies she had tried

had included ice, heat, stretching, exercise, massage, and liniments, in addition to pain medication. *Id.*

Plaintiff first saw Dr. Sharon McKinney on May 31, 1995. Plaintiff reported that she could not do much, that she got headaches if she bent over, and that bending her neck produced migraines, caused her eyes to get fuzzy and hurt her back. *Id.* at 172. Her hips hurt if she walked more than twenty minutes. Plaintiff mentioned her referral to the pain management program, but stated that there was "not enough insurance money left to cover this." *Id.* On examination, Dr. McKinney noted that plaintiff had all eighteen classic trigger points for fibromyalgia, which Dr. McKinney concluded had resulted from the July 1994 motor vehicle accident. *Id.* at 169. Dr. McKinney recommended a "fibromyalgia management sort of program," instead of one for chronic pain, along with stretching, extensive heat, and continued use of medications. *Id.* at 168-69.

**\*\*4** Plaintiff returned to Dr. McKinney in June with worse headaches. *Id.* at 171. Physical findings showed little change. *Id.* In July, Dr. McKinney noted plaintiff's \*987 neck was still mildly limited and numerous trigger points were still present. *Id.* at 170. She advised plaintiff to use heat more aggressively and to continue with exercises. *Id.*

In August of 1995, Dr. McKinney again noted all eighteen classic trigger points for fibromyalgia. *Id.* at 167. Plaintiff reported general all over aching, earaches, and headaches. *Id.* Dr. McKinney stated that the only type of activity plaintiff could do at this point was "very light sedentary non-repetitive non-stressful activity for 1 to 2 hours at the most" and that plaintiff was "substantially limited in employment for at least 90 days." *Id.* At her next visit (date unclear), plaintiff's trigger points were "still 'hot.' " Dr. McKinney noted that plaintiff was becoming deconditioned, a problem "common with fibromyalgia." *Id.* at 166. On October 17, Dr. McKinney noted plaintiff still had trigger points in the "neck, shoulder girdle muscles and pelvic girdle muscles." *Id.* at 164. Plaintiff reported being forgetful and "not always on track," not sleeping well, able to do a few dishes and a little laundry, but

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 Fed.Appx. 983
114 Fed.Appx. 983, 2004 WL 2634571 (C.A.10 (Kan.)), 101 Soc.Sec.Rep.Serv. 258
(Cite as: 114 Fed.Appx. 983)

Page 5

requiring frequent rest breaks and having more pain.
*Id.*

In an October 23 letter recapping plaintiff's medical situation, Dr. McKinney stated that although fibromyalgia is not life threatening, it "can make one's life miserable." *Id.* at 165. She noted that the disorder generally requires medications and is "notorious for remissions and exacerbations." *Id.* In November, plaintiff reported increased pain with the wintery weather. *Id.* at 162. Plaintiff also stated she had tried to get a job but would get one and then become sick and unable to work. *Id.*

In March of 1996, Dr. McKinney determined plaintiff was at maximum medical improvement. *Id.* at 200. By then plaintiff's pain had " 'spread all over' " and she had all the trigger points. Because of pain plaintiff had a mild decrease in her shoulder range of motion and hip girdles. *Id.* Dr. McKinney noted plaintiff was unable to "tolerate stressful situations ... or to do heavy work or any repetitive work." *Id.* In July of 1996, plaintiff saw Dr. Engelken, reporting that she had not made much progress with her fibromyalgia and that stress and noise made her symptoms worse. *Id.* at 261.

In August, plaintiff was seen by Dr. McAllister in the emergency room with increased pain in her neck and shoulders. *Id.* at 273. That same month Dr. McKinney completed a fibromyalgia residual functional capacity (RFC) questionnaire indicating that while plaintiff's prognosis for life was good, her prognosis for normal functioning was poor. *Id.* at 264-65. Dr. McKinney stated that plaintiff was not malingering, her impairments had lasted or could be expected to last at least twelve months, and that her symptoms included multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, numbness and tingling, muscle weakness, subjective swelling and depression. *Id.* at 264-65. Pain was precipitated by weather changes, cold, fatigue, hormone changes, movement/overuse, stress and static positioning. *Id.* at 266. Dr. McKinney stated that plaintiff's symptoms were severe enough to frequently interfere with attention and concentration, and that plaintiff's ability to deal with work stress was markedly

limited. *Id.* at 267.

**5 In assessing plaintiff's general RFC, Dr. McKinney stated plaintiff could walk for one to two blocks, sit continuously for thirty minutes and stand for fifteen (for a total sitting/standing/walking of less than two *988 hours in an eight-hour day). *Id.* at 267-68. Plaintiff would need to be able to walk about five minutes every forty-five minutes, to shift positions at will and take frequent five-to-ten minute unscheduled breaks during an eight-hour work day. *Id.* at 268. Dr. McKinney further stated that plaintiff could occasionally lift and carry less than ten pounds, could bend only two percent of the time, could not twist and was significantly restricted in repetitive reaching, handling and fingering. *Id.* at 269. Plaintiff would likely miss work more than three times a month due to her impairment or need for treatment. *Id.* at 270.

Plaintiff visited the emergency room on October 7, 1996, with complaints of pain to her neck, back, knees, and arms. She showed multiple tender areas along her lower cervical spine. *Id.* at 335. On October 28, 1996, Dr. McKinney reported that plaintiff was doing her exercises and taking hot baths along with her medications. The physical examination indicated plaintiff had all eighteen trigger points, although it was "somewhat difficult to assess [plaintiff's] function otherwise as she is not always consistent in the exam." *Id.* at 331. Dr. McKinney further reported that plaintiff was "having great difficulty dealing with [the fibromyalgia] and is quite limited in her ability to function because of it." *Id.* There is no suggestion that plaintiff was imagining or exaggerating her symptoms. In November of 1996, laboratory tests were ordered to rule out other possible medical problems such as lupus and rheumatoid arthritis. *Id.* at 338-41. Dr. McKinney further noted that plaintiff's fibromyalgia was not a curable disorder. Aplt.App., Vol. II at 480.

In December of 1996, plaintiff complained of muscle twitching, pain and stiffness in her knees, and depression (she noted she did not want antidepressant medication and would go to a support group instead). Trigger points were still present, and her range of motion was still functional. *Id.* at 543. At some

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 Fed.Appx. 983
114 Fed.Appx. 983, 2004 WL 2634571 (C.A.10 (Kan.)), 101 Soc.Sec.Rep.Serv. 258
(Cite as: 114 Fed.Appx. 983)

point, Dr. McKinney signed a form Kansas Certificate of Disability stating that plaintiff was unable to perform substantial gainful activity for the entire year of 1996 based on her disability due to "severe fibromyalgia," accompanied by "fatigue[,] muscle spasms[,] depression[,] and migraines." *Id.* at 546.

In July of 1997, plaintiff reported new problems, including hand pain and more numbness and tingling in her right arm, and a general decrease in activity. *Id.* at 540. Also in July and August of 1997, plaintiff was evaluated for cervical and shoulder problems. She received exercises to perform. *Id.* at 498-514. With a primary diagnosis of cervical pain, *id.* at 500, she was experiencing throbbing, pounding headaches, *id.*, pulling in her neck, *id.*, pain with cervical flexion and extension, *id.* at 501, and moderate pain response with palpitation, *id.* Her pain was better with water, heat, medication, and massage, but worse with stress and bending her head. *Id.* at 503.

**6 In September of 1997, plaintiff reported problems with muscle spasms, mainly on her left side with some numbness and tingling. *Id.* at 539. Dr. McKinney noted plaintiff was very tender around her post hip girdle muscles and exhibited poor hip extension. *Id.* In that same month, Dr. McKinney's treatment notes *reflect that plaintiff's knees felt like rubber sometimes* and her right hand tingled. *Id.* at 538. Plaintiff reported doing limited household chores and taking baths three times a day. *Id.* Trigger points were still present. *Id.*

In April of 1998, plaintiff again saw Dr. Engelken, reporting that she was experiencing *989 "occasional chest pain that is fairly sharp," which she associated with activity, and which radiated down her left arm, causing some numbness. *Id.* at 517. Dr. Engelken thought plaintiff's chest pain was likely anxiety related, but ordered a treadmill test to rule out underlying cardiac disease. *Id.* at 516-17.

In September of 1998, Dr. McKinney completed a medical statement form listing a diagnosis of "significant fibromyalgia [and] depression" associated with decreased sleep, which prevented gainful

employment, was expected to last twelve months or longer, and could not be controlled in that time frame by medication, surgery, or other treatment. *Id.* at 535-37. In December of 1998, Dr. McKinney recommended plaintiff take antidepressants. *Id.* at 534.

Shortly after plaintiff filed her second applications for disability benefits in April of 1998, she was evaluated by two consultative doctors. In July of 1998, Dr. Charles Fantz, Ph.D., diagnosed her as having major depression with, among other issues, depressed mood, lowered pleasure and interest in activities, significant weight gain, insomnia, fatigue, feelings of worthlessness, difficulties with concentration, and continual suicide ideation. *Id.* at 530. He described her behavior as "consistent with her self report of severe depression." Dr. Fantz believed plaintiff was "not able to work at the present time." *Id.* In August of 1998, Dr. Joseph Sankoorikal also observed the possibility of depression. *Id.* at 533. He further noted that she complained "of a lot of pain" and had sleep problems. *Id.* at 532-33. In addition, the record contains numerous later records of medical visits and prescription refills.

## Appellate Issues

On appeal, plaintiff argues, as she did in district court, that the ALJ (1) improperly weighed Dr. McKinney's opinions, (2) improperly analyzed her fibromyalgia, (3) failed to support his psychiatric review technique form by substantial evidence (i.e., plaintiff argues that, with regard to her mental impairments, she satisfied the criteria to meet or equal Listing 12.04 of 20 C.F.R. Pt. 404, Subpart P, App. 1), and (4) failed to apply proper legal standards when evaluating her subjective complaints of pain. Aplt. Br. at i.

## Discussion

### A. *Mental Impairment*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 Fed.Appx. 983                                                                                                        Page 7
114 Fed.Appx. 983, 2004 WL 2634571 (C.A.10 (Kan.)), 101 Soc.Sec.Rep.Serv. 258
(Cite as: 114 Fed.Appx. 983)

**\*\*7** We first address plaintiff's claim that her mental impairment met Listing 12.04. To establish disability based on meeting the requirements of the listed impairment for affective disorders (§ 12.04), plaintiff must show evidence satisfying all listed requirements; to meet the "A" criteria she was required to show medically documented persistence (continuous or intermittent) of (in plaintiff's case) depressive syndrome. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.04(A)(1). To show depressive syndrome requires at least four of the following: anhedonia or pervasive loss of interest in nearly all activities; appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty with concentration or thinking; thoughts of suicide; or hallucinations, delusions, or paranoid thinking, *id.* The ALJ determined that the evidence supported three of these factors: sleep disturbance, psychomotor agitation and difficulty concentrating or thinking. Aplt.App., Vol. II at 458.

In addition, plaintiff must show at least two of the following under the "B" criteria: a limitation degree of "marked," in \*990 the categories of restrictions of activities of daily living, difficulties in maintaining social functioning, or difficulties in maintaining concentration, or a showing of repeated episodes of deterioration or decompensation in a worklike setting. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.04(B). The ALJ rated plaintiff's restrictions in these areas as "slight," as to restrictions on daily living and maintaining social functioning, "seldom" as to concentration deficiencies, and "never" having episodes of deterioration or decompensation. Aplt.App., Vol. II at 462.

[1] The ALJ reviewed the evidence prior to the March 24, 1998, date plaintiff previously was found to be disabled and determined that plaintiff's limitations due to depression before March of 1998 were less than the moderate restrictions the record showed after June of 1998. Contrary to plaintiff's assertion, the ALJ did not rely on Dr. Fantz's report in support of a conclusion that "[p]laintiff's depression initially manifested itself on March 23, 1998." Aplt. Br. at 38. Rather, the ALJ

acknowledged that in June of 1998 Dr. Fantz diagnosed plaintiff with major depression and that the evidence reflected that plaintiff "currently has a mental impairment that could reasonably be expected to produce the alleged work-related limitations." Aplt.App., Vol. II at 450. The bottom line, however, was that there were no "clinical signs or laboratory findings of any significant mental impairment that could reasonably be expected to produce *disabling* symptoms prior to March 24, 1998." *Id.* (emphasis added). Plaintiff's references to other statements she made prior to March 24, 1998, likewise do not establish a significant mental impairment of disabling proportions. *See* Aplt. Br. at 39-40.

**\*\*8** In sum, the ALJ's determination reflects he considered all the evidence of mental impairment even if he did not refer to each piece of it. *See Clifton v. Chater,* 79 F.3d 1007, 1009-10 (10th Cir.1996). We hold that substantial evidence supports the ALJ's finding that plaintiff did not have a disabling mental impairment during the period prior to March 24, 1998.

### B. *Remaining Arguments*

Plaintiff's remaining arguments-that the ALJ failed to properly consider her symptoms of fibromyalgia, the opinions of her treating physician, and her credibility-are all related. We conclude, based on our review of the record, that because the ALJ did not accurately perceive the nature of plaintiff's fibromyalgia, he erroneously failed to properly consider both the treating physician's opinions and plaintiff's statements regarding her symptoms. Critically, moreover, he did not specify what weight he did give Dr. McKinney's opinions, further impeding our review. This was error.

### 1. *Fibromyalgia*

The ALJ recognized plaintiff's diagnosis of fibromyalgia, but seemed to require that it be established by a formalistic clinical or laboratory test. *See, e.g.,* "laboratory testing is not consistent with an

114 Fed.Appx. 983                                                                                                              Page 8
114 Fed.Appx. 983, 2004 WL 2634571 (C.A.10 (Kan.)), 101 Soc.Sec.Rep.Serv. 258
(Cite as: 114 Fed.Appx. 983)

impairment or combination of impairments ... reasonably expected to produce severe and *991 intractable pain [before] ... March 24, 1998," Aplt.App., Vol. II at 445; "no laboratory test has been consistent with ... impairments ... expected to cause the level of disability alleged by [plaintiff]," *id.* at 446, "the clinical signs are not consistent with ... impairments ... reasonably ... expected to cause the level of pain alleged by the [plaintiff]." *Id.* The ALJ stated that Dr. McKinney's opinions on plaintiff's limitations appeared to be based "more on [plaintiff's] subjective complaints and the diagnosis of fibromyalgia than on any clinical signs or laboratory findings," *id.* at 448. In addition to being speculative inferences from medical reports that an ALJ may not make, *see McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir.2002), these examples reflect the ALJ's fundamental misperception of the nature of fibromyalgia.

> FN2. Although he twice referred to this as having first been diagnosed in 1996, *see* Aplt.App., Vol. II at 450-51, plaintiff was in fact so diagnosed by Dr. McKinney in May of 1995. Aplt.App., Vol. I at 169. In addition, plaintiff was treated for trigger points even before that.

Fibromyalgia, previously called fibrositis, is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments and other tissue." *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir.2004). It is a chronic condition, causing "long-term but variable levels of muscle and joint pain, stiffness and fatigue." *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n. 1 (8th Cir.2003). The disease is "poorly-understood within much of the medical community [and] ... is diagnosed entirely on the basis of patients' reports and other symptoms." *Benecke*, 379 F.3d at 590. Clinical signs and symptoms supporting a diagnosis of fibromyalgia under the American College of Rheumatology Guidelines include "primarily widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender points on the body." *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir.2003); *see also*

*Brosnahan, 336 F.3d at 678* (objective medical evidence of fibromyalgia includes consistent trigger-point findings). Fibromyalgia can be disabling. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir.1998).

**9 As described by the Seventh Circuit:
Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. *There are no laboratory tests for the presence or severity of fibromyalgia.* The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

> *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir.1996) (emphasis added).

The ALJ noted that Dr. McKinney had not listed swelling as one of plaintiff's symptoms. Aplt.App., Vol. II at 446. But joint swelling is not a symptom of fibromyalgia, and its absence is therefore no indication that plaintiff's condition is not disabling. *Sarchet*, 78 F.3d at 306. Indeed, it is the absence of symptoms ordinarily associated with joint and muscle pain that is one of the most striking aspects of this disease:

> FN3. This is not entirely accurate. In completing the fibromyalgia RFC questionnaire in August of 1996, Dr. McKinney did list "subjective swelling" as one of plaintiff's symptoms. Aplt.App., Vol. I at 265.

Patients with FMS [ (fibromyalgia) syndrome] usually look healthy. Their joints appear normal, and further musculoskeletal*992  examination indicates no objective joint swelling, although there may be tenderness on palpation. In addition, muscle strength, sensory functions, and reflexes are normal despite the patient's complaints of acral numbness.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 Fed.Appx. 983                                                                                    Page 9
114 Fed.Appx. 983, 2004 WL 2634571 (C.A.10 (Kan.)), 101 Soc.Sec.Rep.Serv. 258
**(Cite as: 114 Fed.Appx. 983)**

The most striking and unique finding in FMS is the presence of multiple tender points. Blind studies have established that these tender points are both quantitatively and qualitatively different from those observed in healthy persons and in those with other chronic pain conditions.... Patients with FMS not only hurt more, but they also hurt in many more places than other patients.

Muhammad B. Yunus, *Fibromyalgia syndrome: blueprint for a reliable diagnosis,* Consultant, June 1996 at 1260.

*Rollins v. Massanari,* 261 F.3d 853, 863 (9th Cir.2001) (Ferguson, J., dissenting).

In a case with strikingly similar underlying facts, the Second Circuit concluded that the ALJ either "did not actually credit the [treating physician's] diagnosis of fibromyalgia or misunderstood its nature." *Green-Younger,* 335 F.3d at 108. Thus the ALJ erred in effectively "requir[ing] 'objective' evidence for a disease that eludes such measurement." *Id.* The court further noted that "[a]s a general matter, 'objective' findings are not required in order to find that an applicant is disabled." *Id.*

[2] Here, the ALJ mentioned the finding of trigger points beginning in November of 1994, as well as plaintiff's treatment with trigger point injections, Aplt.App., Vol. II at 446, but seemed to attach little or no significance to these findings and treatment. Instead, he noted that plaintiff had not attended a pain clinic, work hardening program or behavior modification program. *Id.* To this court it appears the ALJ did not fully understand the nature of plaintiff's diagnosed condition. consequently, the ALJ did not properly analyze Dr. McKinney's opinions.

> FN4. While acknowledging that plaintiff's reason for not doing so may have been financial, the ALJ noted plaintiff obtained a $10,000 judgment from the City of Topeka because of her automobile accident in 1994. Aplt.App., Vol. II at 446 n. 3. He makes no mention of whether she in fact received all of

those funds, nor did he note the nearly $7,000 cost of attending the Kansas Rehabilitation Hospital's pain clinic. *See* Aplt.App., Vol. I at 249. This apparent inference that plaintiff had available resources with which to pursue other avenues for pain relief is thus pure speculation.

> FN5. Moreover, we have held (in assessing chronic fatigue syndrome (CFS)) that the cases do not suggest that "[CFS]-or any other disease-is per se excluded from coverage because it cannot be conclusively diagnosed in a laboratory setting." *Sisco v. United States Dep't of Health & Human Servs.,* 10 F.3d 739, 744 (10th Cir.1993).

### 2. *Treating Physicians' Opinions*

**\*\*10** The ALJ referred to Drs. McAllister and Wilson as treating physicians, Aplt.App., Vol. II at 447. noting that neither had felt that plaintiff "was totally prevented from employment." The restrictions and observances of those doctors, as described by the ALJ, generally occurred prior to plaintiff's November 30, 1994, alleged onset date. In addition. the fact that neither Dr. Wilson nor Dr. McAllister specifically thought plaintiff was unemployable*993 in 1994 or 1995, does not necessarily mean she did not become so at some time prior to March of 1998.

> FN6. Indeed, one of the ALJ's citations to "Dr. Wilson's references [to] 'light duty' work" included his taking her *off* work for three weeks beginning November 30, 1994, Aplt.App., Vol. I at 142, which status was continued through the end of January of 1995. *Id.* at 140-41.

In addition, the ALJ stated that Dr. Wilson found 6 of 18 positive trigger points in November and December of 1994. but no specific ones in plaintiff's thighs in January of 1995. Aplt.App., Vol. II at 446. Not mentioned by the ALJ, however, were the additional "significant trigger points" in the various other areas

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 Fed.Appx. 983
114 Fed.Appx. 983, 2004 WL 2634571 (C.A.10 (Kan.)), 101 Soc.Sec.Rep.Serv. 258
(Cite as: 114 Fed.Appx. 983)

Dr. Wilson found at that same January examination, Aplt.App., Vol. I at 140, or his March 1995 finding of significant trigger points "in the right and left scalenes, right and left upper trapezoids, right upper rhomboid, lower rhomboid, brachialis on the right as well as bilateral quadratus lumborum and gluteous medius." *Id.* at 135.

In assessing Dr. McKinney's numerous opinions and reports, the ALJ did not expressly state whether he treated her as a treating physician. More importantly, however he did not relate what weight he did give her opinions. This was error. The ALJ must first determine whether a treating source's opinion is entitled to controlling weight. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir.2004). This determination, in turn, hinges on whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." *Id.* (quotations omitted). However, even if a treating source's opinion is not entitled to controlling weight, it is still entitled to deference and must be properly evaluated. *See Langley*, 373 F.3d at 1119 (listing factors for evaluation as outlined in 20 C.F.R. § 404.1527). The ALJ must also supply good reasons for the weight he assigns to a treating physician's opinion, and if he rejects entirely that opinion, must provide specific, legitimate reasons for that rejection. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir.2003). These are the steps the ALJ neglected to follow in analyzing Dr. McKinney's reports and opinions.

For example, he described Dr. McKinney's March 1996 opinions as "contradictory." Aplt.App., Vol. II at 448. Given that the purposes of the two reports do not appear to be the same, we disagree. In addition to noting plaintiff was unable to tolerate stressful situations or to perform heavy or repetitive work, Dr. McKinney's March 11 opinion also related plaintiff's complaints of "increased pain [which plaintiff said had] 'spread all over.' " Aplt.App., Vol. I at 200. Dr. McKinney found plaintiff had "all her trigger points" with "a mild decrease in range of motion in the shoulders and hip girdle due to her pain," *id.*, and further stated that plaintiff was at "maximum medical" improvement. The March 24 report, however, was a

Request for Medical Statement questionnaire, listing some fifty-nine specific medical conditions with a place to explain "unlisted or combination impairments." *Id.* at 195-99. In completing her response, Dr. McKinney stated that plaintiff "has significant fibromyalgia which prevents sig[nificant] employment [and] will last the rest of her life unless medicine comes up with a cure." *Id.* at 198. Dr. McKinney reported that this was "intractable (sic) painful despite tx," an opinion she had issued on at least one other occasion as well. *See id.* at 286. We fail to see any contradictions in these two opinions.

**11 The ALJ further acknowledged that Dr. McKinney had stated plaintiff was "not a malingerer," but then stated that "Dr. McKinney also admits there are inconsistencies in [plaintiff's] performance," which the ALJ found "significant when one also notes a suggestion of inconsistency observe[d]*994 ] by Dr. Sankoorikal." *Id.* at 448. But Dr. Sankoorikal, a consulting physician, examined plaintiff only one time in August of 1998. Moreover, he did not state that he observed "inconsistencies," but only that he could not tell whether some of the examination results were based on pain as the limiting factor or because plaintiff was not applying a full effort. *Id.* at 532. Nonetheless, he did not suggest plaintiff was malingering or exaggerating her symptoms, either. To this extent, too, the ALJ appears to have overlooked our requirement that "when a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around." *Hamlin*, 365 F.3d at 1215 (further quotation omitted).

The ALJ also mischaracterized what Dr. McKinney reported, stating that "[i]n August 1995, the physician opined that the claimant could possibly due (sic) part-time, 'very sedentary non-repetitive non-stressful activity,' " Aplt.App., Vol. II at 447, when in fact Dr. McKinney's impression, on physical examination, was that "[a]t this point the *only* kind of activity [plaintiff] can do would be very *light* sedentary non-repetitive non-stressful activity *for 1 to 2 hours at the most.*" (emphasis added). Aplt.App., Vol. I at 167. We have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 Fed.Appx. 983
114 Fed.Appx. 983, 2004 WL 2634571 (C.A.10 (Kan.)), 101 Soc.Sec.Rep.Serv. 258
(Cite as: 114 Fed.Appx. 983)

long held that the ALJ may not "pick and choose which aspects of an uncontradicted medical opinion to believe, relying on only those parts favorable to a finding of nondisability." *Hamlin,* 365 F.3d at 1219. *Accord, Robinson v. Barnhart,* 366 F.3d 1078, 1083 (10th Cir.2004).

Finally, we have noted that the ALJ suggested numerous procedures and "treatments" that plaintiff did not undergo (*e.g.,* work hardening program, back brace, TENS unit, MRI, CT Scan, surgery, *see id.* at 446-47), without any corresponding determination that any of these were ever medically prescribed or would have achieved a better diagnosis or relief from pain. The ALJ, however, is simply "not free to substitute his own medical opinion for that of a disability claimant's treating doctors." *Hamlin,* 365 F.3d at 1221.

Because the ALJ did not follow the proper legal standards in evaluating Dr. McKinney's opinions, his decision that plaintiff was not disabled at any time between her alleged onset date of November 30, 1994, and the March 24, 1998, disability determination date, is not supported by substantial evidence. On remand, the ALJ should follow the analysis we set forth in *Langley,* 373 F.3d at 1119 and *Watkins,* 350 F.3d at 1300-01.

### 3. *Plaintiff's Pain Allegations*

**12 Likewise, the ALJ did not properly consider plaintiff's allegations of pain. Although he accepted her testimony regarding pain from both the 1996 and 2000 hearings, Aplt.App., Vol. II at 445, and recited the appropriate factors to consider, *see Luna v. Bowen,* 834 F.2d 161, 164-66 (10th Cir.1987), he discounted her allegations of "severe and intractable pain" because laboratory testing was "not consistent with an impairment ... that could reasonably be expected to produce" such severe pain. Aplt.App., Vol. II at 445. But two of the "laboratory tests" he mentioned predate both her disability onset date and the second injury that precipitated her being unable to work, *id.,* and one is from the period after the Secretary had found her disability began. *Id.* at 446. The ALJ acknowledged,

in passing, the testimony of plaintiff's housemate corroborating*995 her pain testimony but apparently attached no weight to it, for reasons not readily apparent. *Id.* at 445. As noted, the ALJ recognized that Drs. Wilson and McKinney elicited positive trigger points, and that plaintiff underwent trigger point injections and physical injections. *Id.* at 446. Again, however, the ALJ focused his disbelief of plaintiff's pain claims on the lack of "clinical signs." *Id.* As we earlier noted, fibromyalgia is a condition that is simply not amenable to such clinical determination. *See, e.g., Tennant v. Apfel,* 224 F.3d 869, 870 n. 2 (8th Cir.2000) ( "Fibromyalgia ... [causes] muscle and joint pain, stiffness, and fatigue [and] ... there are no specific diagnostic tests for this affliction."). On remand the ALJ must follow the proper legal standards for evaluation of plaintiff's pain testimony, *see* SSR 96-7p, 1996 WL 374186 (July 2, 1996), and must "closely and affirmatively link[ ] [his findings] to substantial evidence." *Hardman v. Barnhart,* 362 F.3d 676, 679 (10th Cir.2004) (quotation omitted). In so doing, the ALJ should further evaluate the evidence of plaintiff's repeated attempts to seek medical relief for her pain, the numerous medications she has taken and her various other attempts to alleviate the pain. *See id.* at 679-80.

FN7. The ALJ acknowledged that plaintiff "takes several prescription anti-inflammatory, anti-pain, and muscle-relaxant medications." Aplt.App., Vol. II at 447. The record, however, indicates numerous and continuous prescriptions over the course of plaintiff's treatment since her 1994 injuries that have included Tylenol # 3, Flexeril, Toredol, Anaprox, Oruvail, Extra Strength Motrin, Benedryl, Lortab, Klonopin, Ultram, Norflex, Relafen, Darvocet, and Soma. *See* Aplt.App., Vol. I at 145, 146, 162, 164, 166, 167, 170, 200; *id.* at Vol. II at 316-17. This is hardly reflective of "some aches and pains" the ALJ had "no doubt" plaintiff experienced between 1994 and 1998. *Id.* at 449.

### Conclusion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 Fed.Appx. 983
*114 Fed.Appx. 983, 2004 WL 2634571 (C.A.10 (Kan.)), 101 Soc.Sec.Rep.Serv. 258*
**(Cite as: 114 Fed.Appx. 983)**

Page 12

Accordingly, for the above reasons, the judgment of the district court is REVERSED, and the matter is REMANDED with directions to remand to the Secretary for further proceedings consistent with this order and judgment.   Nancy Caplinger's motion to withdraw as counsel for appellee is granted.

C.A.10 (Kan.),2004.
Moore v. Barnhart
114 Fed.Appx. 983, 2004 WL 2634571 (C.A.10 (Kan.)), 101 Soc.Sec.Rep.Serv. 258

Briefs and Other Related Documents (Back to top)

• 2003 WL 24132807 (Appellate Brief) Brief of Appellee (Nov. 17, 2003) Original Image of this Document with Appendix (PDF)
• 03-3253 (Docket) (Aug. 26, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.